**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ACUITY, A Mutual Insurance Company,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 1:25-cv-01103-STA-jay** |
| **v.** | ) | |
| | ) | |
| **HOOSIER CREEK HOSPITALITY, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

Before the Court is a Motion for Summary Judgment (ECF No. 21) filed by Plaintiff Acuity on June 5, 2026. Defendant Hoosier Creek Hospitality, LLC has responded in opposition, and Plaintiff has filed a reply. For the reasons set forth below, the Motion is **DENIED**.

**BACKGROUND**

This is an insurance dispute between Acuity, a mutual insurance company, and its insured Hoosier Creek Hospitality, LLC, over the proper way to calculate Hoosier Creek's insurance claim for lost business income. Acuity seeks a declaratory judgment that its "policy's business income coverage requires consideration of all of Hoosier Creek's revenue streams in calculating the covered business income loss." Compl. Prayer for Relief ¶ 2. Acuity now moves for summary judgment on the issue.

In support of its Motion for Summary Judgment, Acuity has asserted that a number of facts are undisputed for purposes of Rule 56. Local Rule 56.1(a) requires a party seeking summary

judgment to prepare a statement of facts "to assist the Court in ascertaining whether there are any material facts in dispute." Local R. 56.1(a). A fact is material if the fact "might affect the outcome of the lawsuit under the governing substantive law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. For purposes of summary judgment, a party asserting that a material fact is not genuinely in dispute must cite particular evidence in the record and show that the materials fail to establish a genuine dispute or that the adverse party has failed to produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c)(1).

The non-moving party at summary judgment is required to respond to each of the moving party's statements of fact "by either (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed." Local R. 56.1(b). Additionally, the non-moving party may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Where the non-moving party asserts that a genuine dispute of material fact exists, the non-moving party must support its contention with a "specific citation to the record." Local R. 56.1(b). If the non-moving party fails to demonstrate that a fact is disputed or simply fails to address the moving party's statement of fact properly, the Court will "consider the fact undisputed for purposes" of ruling on the Motion. Fed. R. Civ. P. 56(e)(2); *see also* Local R. 56.1(d) ("Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these rules shall indicate that the asserted facts are not disputed for purposes of

summary judgment."). Under Rule 56 of the Federal Rules of Civil Procedure, the Court "need consider only the cited materials" but has discretion to "consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Because this case calls for the proper interpretation of an insurance policy's business interruption clause, the material facts are largely undisputed. Acuity issued Policy No. ZD6659 ("the Policy") to Hoosier Creek Hospitality, LLC ("Hoosier Creek"), providing loss of Business Income coverage, effective from August 8, 2023, to August 8, 2024. (Pl.'s SOF ¶ 1.) The Policy's declarations pages describe two covered premises owned and operated by Hoosier Creek: a Sleep Inn (at 1111 Blue Heron Lane, Union City, Tennessee 38261) and a Holiday Inn (at 810 Bream Boulevard, Union City, Tennessee 38261). (*Id.* ¶ 2.[1])

The Sleep Inn sustained interior water damage loss in January 2024. (*Id.* ¶ 4.) The Sleep Inn was entirely inoperable from January 17, 2024, through October 3, 2024. (Def.'s Add'l SOF ¶ 2.) The Sleep Inn's revenue decreased following the January 2024 water damage during the period of restoration. (Pl.'s SOF ¶ 5.) The Holiday Inn's revenue increased following the January 2024 water damage during the Sleep Inn's period of restoration. (*Id.* ¶ 6.[2]) Hoosier Creek claims a Business Income loss of $1,051,130.00, calculating its loss based solely on the Sleep Inn's lost

---

[1] Hoosier Creek asserts in response that the two hotels also operated as separate business entities, though Defendant has cited no evidence to support its assertion. Hoosier Creek does cite proof of the fact as part of its Statement of Additional Facts. (Def.'s Add'l SOF ¶ 1.) Hoosier Creek also cites evidence that the two properties maintain separate financial and accounting information. (*Id.* ¶ 4.) The Court notes this evidence for the record. However, as Acuity points out, the question of law for the Court is how to construe and give effect to the policy's business interruption coverage. The facts cited by Hoosier Creek, while relevant, do not actually shed light on the proper construction of the policy.

[2] Hoosier Creek does not dispute the claim but denies "that there is a legal or factual correlation between the Holiday Inn's increased revenue and the restoration of the Sleep Inn." While Hoosier Creek cites no evidence to support its characterization of the proof, the Court considers the argument further as part of its interpretation of the policy language.

revenue. (*Id.* ¶ 7.) Acuity calculated Hoosier Creek's Business Income loss at $427,882.83, considering both the Sleep Inn's decreased revenue and the Holiday Inn's increased revenue. (*Id.* ¶ 8.)

Hoosier Creek has cited additional evidence to demonstrate that a decline in business at Sleep Inn would not necessarily produce an increase in business at Holiday Inn. Acuity does not actually dispute the evidence. Instead, Acuity argues that the evidence is not material to the questions presented about the correct construction of the insurance policy. The Court tends to agree the facts are not entirely material to the issues presented in the Motion for Summary Judgment. Acuity has moved for judgment as a matter of law on the proper interpretation of the Policy. The additional facts cited by Hoosier Creek relate to the parties' dispute over whether the temporary closing of the Sleep Inn caused an increase in business at the Holiday Inn. Acuity has not moved for summary judgment on that issue. Nevertheless, the Court will note the proof for the record.

A substantial number of guests who stay at the Holiday Inn exhibit brand preference or perceived quality preference for the Holiday Inn brand and would not be interested in staying at a Sleep Inn property. (Def.'s Add'l SOF ¶ 7.) The Sleep Inn property serves as a more cost-effective lodging option and attracts guests who prioritize affordability and value over brand prestige or premium amenities. (*Id.* ¶ 8.) The Holiday Inn generally charges a higher nightly rate than the Sleep Inn for comparable room accommodations. (*Id.* ¶ 9.) The difference in pricing between the two properties reflects the different market segments each property serves and the different amenities and service levels each property provides. (*Id.* ¶ 10.) The two properties do not serve interchangeable customer bases, as each attracts guests with distinct preferences, priorities, and expectations regarding their hotel accommodations. (*Id.* ¶ 11.) The distinct nature of the clientele served by each property, driven by brand preference, quality expectations, and price sensitivity,

means that the two hotels operate as separate and independent businesses serving different market segments. (*Id.* ¶ 12.)

The parties take differing views on how the Policy defined a "loss of business income." Acuity argues that the loss of business income should be measured for the named insured, Hoosier Creek, across both properties covered by the Policy. The Policy named Hoosier Creek as the insured and then listed the two hotels as covered properties. The Policy's loss of business income should measure Hoosier Creek's net change in business income, not merely Hoosier Creek's loss of business income at the Sleep Inn. So while the Sleep Inn could not engage in business as usual during the repair and remediation of the property, Hoosier Creek's Holiday Inn property showed an increase in revenue. Acuity argues that Hoosier Creek's loss of business income should take into account the higher revenue generated by the Holiday Inn. Acuity concedes the Policy's loss of business income coverage is triggered by a loss at "the described premises," that is, either the Sleep Inn or the Holiday Inn. However, once a loss occurred at one of "the described premises," the coverage only extends to an actual loss sustained by Hoosier Creek." To accept Hoosier Creek's position would put the insured in a better position than it would have been in without the loss.

Hoosier Creek counters that the Policy defined a loss of business income to mean the loss of business income at the Sleep Inn itself. Acuity's proposed interpretation of the Policy language renders the Policy ambiguous. The Policy's loss of business income coverage is susceptible to more than one reading or understanding. A plain reading of the Policy suggests that the loss of business income means the business income lost at the property where the covered loss occurred. Acuity's interpretation that the Policy requires an analysis of each property's business income to

determine a net loss of income is not spelled out in the Policy. The supposed ambiguity should be resolved in favor of coverage and against Acuity.

Hoosier Creek concludes by arguing that there is no evidence to show that the increase in business at the Holiday Inn property had any connection to the temporary closure of the Sleep Inn property. Both properties are located near Discovery Park of America, a fact which drives bookings at the hotels. Hoosier Creek contends that without evidence to show greater hotel traffic in the area, for example, an increase in attendance at Discovery Park, it is just as likely Hoosier Creek's revenue at the Holiday Inn increased for reasons unrelated to the closing of the Sleep Inn during the time required to repair the water damage at that property.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The question for the Court is whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In other words, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law." *Id.* at 251–52. The Supreme Court has stated that "[t]hough determining whether there is a genuine issue of material fact at summary judgment is a question of law, it is a legal question that sits near the law-fact divide." *Ashcroft v. Iqbal*, 556 U.S. 662, 674 (2009). In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986), and the "judge may not make credibility determinations or weigh the evidence." *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

In this Circuit, the nonmoving party must "'put up or shut up' [on] the critical issues of [its] asserted causes of action." *Lord v. Saratoga Cap., Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)). When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In this case the Court has subject-matter jurisdiction by virtue of the parties' diversity of citizenship and the amount in controversy. 28 U.S.C. § 1332. A federal court sitting in diversity applies the law of the forum state, including the forum's choice-of-law rules. *Atl. Marine Constr. Co. Inc. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 134 S. Ct. 568, 582 (2013); *Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 692 (6th Cir. 2013). In contract cases, Tennessee follows the rule of *lex loci contractus*, meaning that "a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent" such as a valid contractual choice-of-law provision. *Se. Texas Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 672 (6th Cir. 2006) (applying Tennessee law); *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973). The parties in this case agree that the substantive law of the state of Tennessee

governs their contractual dispute. As such, the Court will apply Tennessee law in reaching the questions of contract law presented at summary judgment.

**ANALYSIS**

The parties' dispute concerns how to interpret the Policy's contractual language defining coverage for loss of business income and what that interpretation says about the proper measure of Hoosier Creek's loss of business income. The Court's analysis of these questions begins and ends with a correct construction of the language in the Policy itself, which is after all a contract.

Under Tennessee law, courts construing the terms of a contract ascertain the intent of the parties based on the ordinary and natural meaning of the words used in the instrument. *Perkins v. Metro. Gov't of Nashville*, 380 S.W.3d 73, 85 (Tenn. 2012); *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008). A court must consider the entire contract in construing any or all of its parts. *Cocke Cnty. Bd. of Highway Cm'rs. v. Newport Util. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985). This means that "a contract must be viewed from beginning to end, and all its terms must pass in review, for one clause may modify, limit, or illuminate another." *Id.* The construction of a contract presents a question of law. *Toomey v. Atyoe*, 32 S.W. 254, 256 (Tenn. 1895); *Manley v. Plasti-Line, Inc.*, 808 F.2d 468, 471 (6th Cir. 1987); *see also* 10B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 2730.1 (3d. ed. 2009) ("The legal effect or construction of a contract is a question of law that properly may be determined on a summary-judgment motion when the parties' intentions are not in issue.").

As a threshold matter, the Acuity Policy has the features of an all-risk policy. "Unlike typical property loss policies which are structured to cover losses for which the parties contract, an all-risk policy automatically covers any loss unless the policy contains a provision expressly excluding the loss from coverage." *Zitzow v. Auto-Owners Insurance Co.*, No. 22-5549, 2023 WL

2033792, at *4 (6th Cir. Feb. 16, 2023) (applying Tennessee law and citing *HCA, Inc. v. Am. Prot. Ins. Co.*, 174 S.W.3d 184, 187 (Tenn. Ct. App. 2005)). Here, the Policy defined "Covered Causes of Loss" to be "Risks of Direct Physical Loss" unless excluded or otherwise limited under the terms of the Policy. Acuity Policy 3 (ECF No. 1-3, Page ID 47). This language is consistent with an all-risk policy. Under Tennessee law, an all-risk policyholder like Hoosier Creek has "the initial burden of proving that a loss comes within the terms of the policy . . . ." *Id.* (quoting *Se. Med. Health Ctr., Inc. v. Pac. Ins. Co., Ltd.*, 439 F. Supp. 2d 831, 835 (W.D. Tenn. 2006)).

At issue is Hoosier Creek's insurance claim for an interruption of its business at the Sleep Inn property and the loss of business income during the period of interruption. "The purpose of business interruption insurance is to protect the insured against losses that occur when its operations are unexpectedly interrupted, and to place it in the position it would have occupied if the interruption had not occurred." *Continental Ins. Co. v. DNE Corp.*, 834 S.W.2d 930, 934 (Tenn. 1992) (citations omitted). There is no genuine dispute that Acuity's Policy provides coverage for a business interruption. Acuity's Policy provided coverage when a loss caused an interruption of Hoosier Creek's business at one of the "described premises" identified in the Policy's declarations page, two hotel properties owned by Hoosier Creek located in Union City, Tennessee, a Sleep Inn and a Holiday Inn.

Furthermore, there is no genuine dispute that Hoosier Creek suffered a loss of business income because of a covered loss at its Sleep Inn property. The vast majority of recent litigation involving business interruption coverage arose out of the COVID-19 pandemic and state mandates closing businesses to the public. *E.g. Brown Jug, Inc. v. Cincinnati Ins. Co.*, 27 F.4th 398, 400 (6th Cir. 2022) (affirming dismissal of the insured's claims for business interruption "because neither the presence of the COVID-19 virus nor shutdown orders issued by the Michigan governor

constituted physical loss or damage."). Unlike recent pandemic-related coverage disputes where insurance companies denied business interruption claims, Acuity concedes that Hoosier Creek experienced a covered loss of business income when the Sleep Inn property sustained water damage and required Hoosier Creek to close the property for several months in 2024.

The issue presented is the proper construction of the coverage for loss of business income. Acuity moves for judgment as a matter of law on its interpretation that Hoosier Creek's lost income should account for higher revenue Hoosier Creek earned at its Holiday Inn property during the interruption of Hoosier Creek's business at the Sleep Inn property. Hoosier Creek responds that its lost income is only the revenue it would have earned at the Sleep Inn property but for the business interruption caused by covered water damage. The key contractual language appears in the Policy's "Additional Coverages," one of which is coverage for "Business Income and Extra Expense."

> **g. Business Income and Extra Expense**
>
> (1) We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your operations during the period of restoration. The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss.
>
> . . . .
>
> (2) Business income means the:
>
> (a) Net income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses; and
>
> (b) Continuing normal operating expenses incurred, including payroll.

Acuity Policy 6 (Page ID 50).

The Court begins with Acuity's promise to "pay for the actual loss of Business Income you sustain due to the necessary suspension of your operations." "A court's initial task in construing a contract is to determine whether the language of the contract is ambiguous." *Planters Gin Co. v. Federal Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). "If the contract language is unambiguous, then the parties' intent is determined from the four corners of the contract." *Ray Bell Const. Co., Inc. v. State, Tenn. Dept. of Transp.*, 356 S.W.3d 384, 387 (Tenn. 2011) (citing *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998)).

The Policy identifies "you" and "your" as Hoosier Creek. The Policy also defines several of the terms used in the "Business Income" provision. "Operations" is defined to mean "your business activities occurring at the described premises." *Id*. at 27 (Page ID 71). The term "premises" can be either singular or plural. *Fox v. Galloway*, 148 P.2d 922, 926 (Or. 1944) ("The word 'premises' may be construed not only in the singular, but in the plural as well, as the context may indicate."). The Policy describes two "premises," "Premises Number 001" identified only by its street address at 1111 Blue Heron Lane in Union City, and "Premises Number 002" identified as the business located at 810 Bream Boulevard, also in Union City. Policy Am. Decl. Page 2–3 (Page ID 31–32). It is undisputed that "Premises Number 001" is the Sleep Inn property and "Premises Number 002" the Holiday Inn property. The Court construes "operations" then to mean Hoosier Creek's business activities occurring at the Sleep Inn property and the Holiday Inn property.

A "suspension" can have one of two meanings, according to the Policy: (a) "The partial slowdown or complete cessation of [Hoosier Creek's] business activities; or (b) "That a part or all of the described premises is rendered untenantable." Acuity Policy 7 (Page ID 51). This aspect of the Policy is somewhat ambiguous. Paragraph (a) refers to "business operations" and suggests the

"suspension" must impact Hoosier Creek's overall business, either as a "partial slowdown" or "complete cessation." The temporary closing of the Sleep Inn is not necessarily a "partial slowdown." The parties appear to agree that Hoosier Creek was unable to conduct any business at all at the Sleep Inn for most of 2024. The closing would arguably qualify as a "complete cessation" of Hoosier Creek's business but only at the Sleep Inn, not at both "described premises."

Paragraph (b) focuses on the "untenantability" of the "described premises." "When called upon to interpret a term used in an insurance policy that is not defined therein, courts in Tennessee sometimes refer to dictionary definitions." *Am. Just. Ins. Reciprocal v. Hutchison*, 15 S.W.3d 811, 815 (Tenn. 2000) (citing Black's Law Dictionary). "Tenantability" means capable of being held or occupied. *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/tenant. Accessed 30 Sep. 2026. The "described premises" would be "untenantable" if the properties were not capable of being held or occupied. Once more, that definition would only apply to the Sleep Inn property.

This construction of the Policy as applied to the facts of the case presents two plausible understandings of the term "suspension." On the one hand, a "suspension" might mean an impact on Hoosier Creek's "business activities" at *both* "premises," a reading that would line up with Acuity's preferred interpretation of the contract. The loss of business income would take into account the effect of the "suspension" on Hoosier Creek's overall business at both covered "premises." On the other hand, a "suspension" might mean an impact on Hoosier Creek's "business activities" only at the property where the "Covered Cause of Loss" occurred and either caused a "complete cessation" of business or left the property "untenantable." Obviously that construction of the term only applies to the Sleep Inn property and supports Hoosier Creek's interpretation of the Policy. Acuity agreed to cover Hoosier Creek's loss of business income if

there was a "necessary suspension" of Hoosier Creek's "business activities" at the "described premises." The only "necessary suspension" of business activities in this case occurred at the Sleep Inn property, not at the Holiday Inn.

Because the Policy covers two different "described premises" and in this case only one property sustained a "loss," the Policy's use of the term "suspension" is susceptible to more than one meaning. The parties have not specified which description applied to the "necessary suspension" of operations experienced by Hoosier Creek. Regardless, Acuity does not dispute that Hoosier Creek experienced a "necessary suspension" of its "operations" at the Sleep Inn property. There is no evidence that any "necessary suspension" of Hoosier Creek's "operations" at the Holiday Inn property occurred. If anything, the proof suggests that Hoosier Creek's revenue at the Holiday Inn increased during the time when the Sleep Inn property's business was interrupted, though the reason for the increase is disputed. Therefore, the only evidence of a "necessary suspension" of "operations" in this case is the interruption of business at the Sleep Inn property.

Next, the "necessary suspension of [Hoosier Creek's] operations" at the Sleep Inn property must cause an "actual loss of Business Income." The Policy is specific. Hoosier Creek had to sustain a loss of Business Income "due to" the suspension of operations at the "described premises." The phrase "due to" means "as a result of" or "because of." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/due%20to. Accessed 30 Sep. 2026. The use of the phrase "due to" plainly suggests a causal connection between the "suspension of operations" and the "actual loss of Business Income." Only then is Acuity's coverage obligation triggered.

And not just any loss of revenue qualifies as an "actual loss" of "Business Income." "Business Income" specifically means "[n]et income (Net Profit or Loss before income taxes) that

would have been earned or incurred if no physical loss or damage had occurred . . ." plus "[c]ontinuing normal operating expenses incurred, including payroll." *Id.* at 6 (Page ID 50); *see also DNE Corp.*, 834 S.W.2d at 932 (holding that "actual loss of business income" was defined as "net income that would have been earned had the business not been interrupted *and* continuing normal operating expenses that were incurred during the interruption of business") (emphasis in original).

The problem is the Policy fails to explain how to define or determine an amount of "net income . . . that would have been earned . . . ." Acuity drafted the sentence defining "net income" in the passive voice. The Policy, therefore, begs the question, where do the parties look to determine the amount of income "that would have been earned" and, more importantly, where and how the income "would have been earned"? The loss of Hoosier Creek's net income from both the Sleep Inn and the Holiday Inn properties? Or just the loss of Hoosier Creek's net income from the Sleep Inn?

Acuity plausibly argues that the Policy covers the loss of "net income" Hoosier Creek would have earned from *both* properties identified in the Policy. When the provision states "net income . . . that would have been earned," the Policy means earned by *Hoosier Creek*, taking into account any higher revenue the company earned at the Holiday Inn to offset the loss of revenue at the Sleep Inn. This reading is consistent with the Tennessee Supreme Court's dicta that an all-risk policy's business interruption coverage "may not be used to place the insured in a better position than it would have occupied in the absence of the catastrophe." *DNE Corp.*, 834 S.W.2d at 932 (citing *Supermarkets Operating Co. v. Arkwright Mut. Ins. Co.*, 257 F. Supp. 273, 277 (E.D. Penn. 1966)). The Court finds that Acuity has proposed one permissible reading of the Policy's coverage for the loss of "net income."

However, Acuity's construction of the Policy is not the only way to interpret the definition of "net income." Hoosier Creek has proposed another permissible reading of the phrase. Hoosier Creek argues the phrase "would have been earned" means earned at the property where the "suspension" of "operations" occurred, the Sleep Inn. The Policy covers loss resulting from risks at covered property. In Hoosier Creek's view, the Court should give the policy effect by reading "net income" to mean income "that would have been earned" only from the Sleep Inn, but for the covered loss at the hotel. Without evidence to show Hoosier Creek sustained any covered loss at the Holiday Inn property, the fact that Holiday Inn may have experienced higher revenue has no impact on the Policy's coverage for loss of "Business of Income" at the Sleep Inn.

The additional sentence near the end of the Policy's "Business Income and Extra Expense" provision does not clarify the ambiguity. The Policy, in what is arguably a summation of the "Loss of Business Income" coverage, states that Hoosier Creek's "Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss." Acuity Policy 7 (Page ID 51). The statement is not a model of clarity, if for no other reason than the fact that it uses the word "cause" three times in a single sentence. Putting the inartful wording aside, the Court reads the statement to condition Acuity's promise to pay for lost business income on what could be described as a causal chain of events: (1) a "Risk of Direct Physical Loss"[3] must have caused direct physical loss or damage at the Sleep Inn, and (2) the water damage at the Sleep Inn property must cause a loss of "Business Income." This provision sheds no additional light on how best to determine Hoosier Creek's lost "net income."

---

[3] As previously noted, the Policy defines a "Covered Cause of Loss" as a "Risk of Direct Physical Loss."

If anything, the provision suggests that the loss of "Business Income" is just the lost income from the Sleep Inn.

Confronted with two plausible readings of the same contractual provision, the Court holds that the provision is ambiguous. Both parties have advanced plausible readings of the Policy's "Business Income" provision. Under Tennessee contract law, terms are not ambiguous merely because the parties disagree as to the interpretation of a given clause. *Cookeville Gynecology & Obstetrics, P.C. v. Se. Data Sys., Inc.,* 884 S.W.2d 458, 462 (Tenn. Ct. App. 1994). Whatever merit each party's reading of the "Business Income" provision may have, neither party's construction yields a clear and unambiguous reading of the contract as a whole. In the final analysis, the Court cannot determine the intention of the parties "by a literal interpretation of the language" in the Policy. *Maverick Grp. Mktg., Inc. v. Worx Envtl. Prods., Inc.*, 99 F. Supp. 3d 822, 836 n.45 (W.D. Tenn. 2015) (quoting *Planters Gin. Co.*, 78 S.W.3d at 890)). As a result, the Court concludes that the "Business Income" provision, specifically, the provision's use of the term "suspension" and the phrase "would have been earned," is ambiguous. The "Business Income" provision is "of uncertain meaning and may fairly be understood in more ways than one." *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975).

The Court must now proceed to employ rules of construction to arrive at the meaning of the "Business Income" provision. *Planters Gin Co.*, 78 S.W.3d at 890; *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006).[4] "[C]ontracts of insurance are strictly construed in favor of

[4] The Court's use of the rules of construction to resolve an ambiguity on the face of the contract continues to be a question of law, properly considered at summary judgment under Rule 56 of the Federal Rules of Civil Procedure. "Only if ambiguity remains after the court applies the pertinent rules of construction does the legal meaning of the contract become a question of fact" for a jury to resolve. *Planters Gin Co.*, 78 S.W.3d at 890 (quoting *Smith v. Seaboard Coast Line R.R. Co.*, 639 F.2d 1235, 1239 (5th Cir. 1981)).

the insured, and if the disputed provision is susceptible to more than one plausible meaning, the meaning favorable to the insured controls." *Garrison v. Bickford*, 377 S.W.3d 659, 664 (Tenn. 2012) (citations omitted). In light of this well-settled principle, the Court strictly construes the Policy's "Business Income" provision and gives the provision the meaning favorable to Hoosier Creek as the insured. The Court construes the provision to cover a loss of Hoosier Creek's net income that Hoosier Creek would have earned at the Sleep Inn property plus its continuing normal operating expenses incurred, including payroll, but for the interruption of Hoosier Creek's business activities at the Sleep Inn during the period of restoration.

Having arrived at the correct construction of the Loss of Business Income provision, Acuity has not shown why it is entitled to judgment as a matter of law. Acuity's Motion for Summary Judgment must be **DENIED**. Because Hoosier Creek has not filed its own Rule 56 request for judgment as a matter of law and a bench trial is currently set for January 19, 2027, the parties are directed to file a status report with the Court, stating what issues remain for trial. The parties' status report is due within 14 days of the entry of this order.

## CONCLUSION

The Court holds that Acuity is not entitled to judgment as a matter of law on its interpretation of the Policy's Loss of Business Income provision. Therefore, Acuity's Motion for Summary Judgment is **DENIED.**

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: October 15, 2026.